[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15643

_____

D.C. Docket No. 2:15-cr-00017-AKK-WC-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MICHAEL ALBERT FOCIA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 6, 2017)

Before ED CARNES, Chief Judge, and ROSENBAUM and DUBINA, Circuit
Judges.

ROSENBAUM, Circuit Judge:

The Dark Web.  For many, the name conjures images of a suspect shadow internet world where virtually anything can be bought for the right price.[1]  Indeed, Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") Special Agent Tully Kessler described the Dark Web as "another side of the Internet . . . access[ible] through your Internet provider . . . [but only using] special software."  He opined that it "allow[s] the sale and trade of all kinds of things that you would never find on a regular website open to the public."  And the Dark Web—on, in one case, a site called Black Market Reloaded—is where Defendant-Appellant Michael Albert Focia chose to sell firearms domestically and internationally.

A jury convicted Focia of dealing in firearms without a federal firearms license, in violation of 18 U.S.C. § 922(a)(1)(A), and selling firearms to unlicensed residents of states other than his own without having a license to do so, in violation of 18 U.S.C. § 922(a)(5).  He now challenges the sufficiency of the evidence to convict him, the jury instructions, the constitutionality of the criminal statutes of which he was convicted, and his sentence.  After careful consideration, and with the benefit of oral argument, we affirm Focia's conviction and sentence.

## I.[2]

---

[1] In fact, the Dark Web also has a different side.  Because of its layered encryption system, it plays an important role in providing safe fora for, among others, whistleblowers and journalists.

[2] We take these facts from the evidence adduced at trial, which we view in the light most favorable to the government.  *See United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997).

ATF Special Agent Kessler visited Black Market Reloaded on the Dark Web. Acting in an undercover capacity, Kessler agreed to buy a Smith & Wesson M&P Shield .40-caliber pistol, serial number HPP9188, for fifteen bitcoins, or $1,601.95, from someone who identified as "iWorks." Kessler placed his order on August 7, 2013, directing the gun to be sent to an address in Omaha, Nebraska.

A message from iWorks arrived in response almost immediately, confirming the purchase and advising that delivery was scheduled for August 9, 2013. At no point did iWorks ask whether Kessler had a federal firearms license.

As promised, on August 9, 2013, Kessler received through the United States Postal Service a priority-mail box that contained a Smith & Wesson .40-caliber firearm, serial number HPP9188, and two magazines. The package was mailed from an address in Montgomery, Alabama. That same day, iWorks left Kessler a message that read, "Dude, the gun shows delivered. Are you happy or what? Please don't forget about me. I busted my ass to get it to you in two days."

In an effort to discover the identity of "iWorks," ATF agents ran a trace on the Smith & Wesson firearm and learned that it had been purchased on July 29, 2013, from a store in Montgomery, by a man named Alan Turner. So ATF agents met with Turner on November 15, 2013. Turner told them that he had sold the Smith & Wesson firearm in question on August 2, 2013, to a man named "Mike." He also provided ATF with the Alabama license-plate number on Mike's vehicle.

3

A database search of the license-plate number revealed that it was registered to Presley Focia of Prattville, Alabama, and had previously been registered to Presley's father, Michael Focia, at 204 Seminole Drive, Montgomery, Alabama. Based upon this information, and suspecting that the man Turner referred to as "Mike" was Defendant-Appellant Michael Albert Focia, ATF Special Agent Jennifer Rudden-Conway showed Turner a photographic lineup that included Focia's photograph. From this lineup, Turner identified Focia as the "Mike" who had purchased the Smith & Wesson firearm from him.

Further investigation led Rudden-Conway to Jessica Busby, an employee at a UPS store located in Montgomery, Alabama. Rudden-Conway presented Busby with the same lineup she showed Turner. Like Turner, Busby also identified Focia. Busby explained that she had helped package a box for him at her store on August 7, 2013. According to Busby, Focia identified the box's contents as a computer mother board. Although Focia packaged the box at Busby's store, Busby noted that he took the box with him to mail himself. Busby's store's mail person had already left for the day, and Focia told Busby that the package was "very important and that he was trying to get it out that day."

Upon linking Focia to the sale of the firearm to Kessler, Rudden-Conway decided to further investigate Focia. As it turned out, ATF's Intelligence Division had information concerning eighteen packages mailed internationally in the two-

4

month period between September 23 and November 18, 2013, from a return address identified as Computer Doctor, 478 Opelika Road, Auburn, Alabama. The Australian Customs Service intercepted two of these packages—one headed for Melbourne, Australia, in September 2013 and another headed for Taylor Hills, Australia, in November 2013. Authorities were aware that sixteen other packages had been shipped using the Computer Doctor name, but they never intercepted those packages.

On the Customs declaration form, the sender identified the package shipped to Melbourne as a refurbished computer hard drive. But the package contained no such item. Instead, it held a Kel-Tec PF-9 handgun and magazine wrapped in cardboard, duct tape, and metal sheeting—approximating the size and shape of a computer hard drive—and placed in a Dri-Shield moisture barrier bag. A trace of the serial number on the firearm revealed that it had last been sold to Focia.

As for the package shipped to Taylor Hills, it contained a Glock Model 26 9mm handgun and two magazines. ATF determined, through a firearms trace, that someone driving a vehicle with an Alabama license plate registered to Focia had purchased this gun. Like the firearm in the Melbourne package, this weapon was also wrapped to appear as though it was a computer hard drive.[3]

---

[3] A third package intercepted in Australia on April 29, 2014, was similarly traced back to Focia. Though the package had not been sent from the Computer Doctor address, it nonetheless contained a firearm that had been identified as computer parts in the Customs declaration. The

5

ATF's investigation of Focia continued into 2014.  In October of that year, ATF agents completed a second undercover firearms purchase from the seller they believed to be Focia—this time through Agora, another website on the Dark Web.

ATF Special Agent John Harrell created a fake account and used it to buy a Glock Model 27 .40-caliber pistol and two magazines from seller "RTBArms." Harrell told RTBArms that he was looking to purchase a gun through Agora to evade the firearms restrictions of his home state of New York, so he instructed RTBArms to mail the firearm to an address in Newark, New Jersey.

The package was mailed using the United States Postal Service and bore a return address in Montgomery, Alabama.  Like the weapons intercepted in Australia, the firearm sent to Harrell was wrapped in cardboard, tape, and metal, and it was placed inside a heat-sealed bag.  It arrived at a post-office box in Newark, New Jersey, on October 25, 2014.  A forensic analysis of the interior packaging identified a latent fingerprint that belonged to Focia.

Further investigation revealed that Focia neither had nor ever possessed a federal firearms license.  Nor were agents able to identify any alternate sources of income for Focia, since Focia had failed to file federal income tax returns for the

---

package bore a return address in Vestavia Hills, Alabama, and a trace of the firearm revealed that Focia had bought it on November 16, 2013, from a pawn shop in Alabama.

6

years 2010 and 2012 through 2014.  A search of Focia's Social Security number likewise showed no active employment.

In light of this information, ATF obtained a warrant to search 55 Boathouse Road in Eclectic, Alabama, a house ATF believed to be Focia's residence.[4]  The search yielded the following items: (1) a safe loaded with firearms and ammunition; (2) a stack of empty firearms boxes with their serial numbers torn off; (3) packaging and shipping materials, including heat-sealing materials, a Dri-Shield, bubble-foam mailing envelopes, USPS priority mail boxes, duct tape, and a roll of metal sheeting; (4) Focia's expired driver's license, with an address at 204 Seminole Drive in Alabama and an expiration date of December 22, 2013; (5) an E*Trade Financial document bearing the name "Michael A. Focia" and an address at 204 Seminole Drive in Alabama; and (6) a receipt bearing the name "Michael Albert Focia" and an Alabama address for Focia, for a firearm purchase made on April 19, 2010, from a pawn shop in Alabama.  One of the firearms recovered, an H&K USP Tactical .45-caliber handgun with threaded barrel, matched a gun listed for sale on Agora on October 16, 2014, by the vendor RTBArms.

## II.

On March 18, 2015, a grand jury returned a superseding indictment charging Focia with being in the business of dealing firearms without a license, in violation

---

[4] At trial, Rudden-Conway testified that agents had surveilled the residence for a year and a half and had used a GPS tracker to conclude that the home was Focia's residence.

of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D) (Count 1); transferring

firearms to residents of states other than his own without a federal firearms license,

in violation of 18 U.S.C. §§ 922(a)(5) and 924(a)(1)(D) (Counts 2 and 3);[5] and

interfering with communication systems (Count 4).[6]

Before trial, Focia, proceeding *pro se*, moved to dismiss Counts 1, 2, and 3

of the indictment as violative of his rights under the Second Amendment.   The

magistrate judge issued a report and recommendation ("R&R") recommending that

Focia's motions be denied, and the district court adopted the R&R.

Trial began on June 15, 2015.  At the close of the Government's case, Focia

moved for a judgment of acquittal on Counts 2 and 3 on the basis that the

Government failed to establish Focia's residency in Alabama.  The district court

denied Focia's motion.

After resting, Focia renewed his motion for judgment of acquittal on the

same grounds, which the district court denied as to all counts.  The district court

also overruled Focia's objections to the jury instructions as to Count 1, dealing in

firearms without a license.  The next day, the jury returned its verdict, finding

Focia guilty on Counts 1, 2, and 3.

---

[5] Count 2 is based upon Focia's August 9, 2013, shipment of a firearm to Kessler in Nebraska, and Count 3 is based upon Focia's October 27, 2014, shipment of a firearm to Harrell in New Jersey.

[6] Count 4 is based upon Focia's alleged use of an electronic signal-jamming device.  The jury acquitted him of Count 4, so we do not discuss it further in this opinion.

The United States Probation Office filed its Presentence Investigation Report ("PSR") on November 12, 2015, assigning Focia a total offense level of 22 and criminal history category of I.  That corresponded to a guidelines range of 41 to 51 months, with a statutory maximum sentence of 60 months.  Both the government and Focia filed objections to the PSR.

At the sentencing hearing on November 24, 2015, the district court heard testimony from Rudden-Conway.  It then sustained the government's objection and overruled Focia's objections.  As a result, the district court calculated Focia's offense level to be 24, with a criminal history category of I, resulting in a guidelines range of 51-60 months.  The district court then sentenced Focia to 51 months' imprisonment on Counts 1, 2, and 3, to be served concurrently, and noted that it would have sentenced Focia to 51 months, regardless of how the issues raised by the parties had been resolved.  Focia now appeals his conviction and sentence.

## III.

Focia challenges his conviction and sentence on multiple grounds.  First, he takes issue with the sufficiency of the evidence as to Counts 2 and 3.  Second, he argues that the jury instructions as to Count 1 allowed the jury to convict him for conduct not criminalized under the plain language of 18 U.S.C. § 922(a)(1)(A).  Third, he contends that § 922(a)(1)(A), the statute under which he was charged in

Count 1, is an impermissible prior restraint in violation of the Second Amendment. Fourth, he asserts that any restriction on his right to transfer firearms based solely on residency (the basis for a violation of 18 U.S.C. § 922(a)(5) as charged in Counts 2 and 3) violates the Second Amendment. And finally, he challenges the district court's determination of his guidelines range and sentence. We address each argument in turn.

## A.

Focia makes two separate arguments concerning the sufficiency of the government's evidence to convict him of violating 18 U.S.C. § 922(a)(5), as charged in Counts 2 and 3 of the superseding indictment. To prove that a defendant violated 18 U.S.C. § 922(a)(5), the government must offer evidence of four essential elements:

> (1) the defendant was not a licensed firearms importer, manufacturer, dealer, or collector; (2) the defendant transferred, sold, traded, gave, transported, or delivered a firearm to another person; (3) the person to whom the defendant transferred the firearm was not a licensed importer, manufacturer, dealer, or collector; and (4) the defendant knew or had reasonable cause to believe that the person to whom the firearm was transferred did not reside in the defendant's state or residence.

*United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013).

First, Focia posits that his convictions on these counts must be vacated because the government failed to prove that he and each transferee were not

10

residents of the same state at the time of each sale.  Second, he asserts, for the first time on appeal, that his conviction as to Count 2 must be vacated because the firearm recipient's federal-firearms-license status at the time of the transfer was not in the record.  We are not persuaded by either argument.

*1. Residency*

Focia contends that the government failed to present evidence that, at the time of the sale of the firearms to Kessler in Nebraska and Harrell in New Jersey, Focia was a resident of a different state, namely Alabama.  At most, Focia argues, the government established only that Focia used to live in Alabama at some point before the firearm sales and that he was present in Alabama several times over the span of two years.  We disagree.

We review de novo the sufficiency of evidence to support a conviction. *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003).  We will affirm a conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Hunt*, 187 F.3d 1269, 1270 (11th Cir. 1999) (internal quotation marks omitted) (emphasis in original).  In making this determination, we view the evidence in the light most favorable to the government and accept all reasonable inferences in favor of the jury's verdict. *United States v. Chirinos*, 112 F.3d 1089, 1095 (11th Cir. 1997).

Here, the government introduced sufficient evidence of Focia's residence to sustain Focia's convictions under Counts 2 and 3. First, the government presented evidence directly tying Focia to Alabama, including Focia's driver's license, which bore an address in Montgomery, Alabama, and did not expire until December 22, 2013—three months after Focia completed his transaction with Kessler; and documents from E*Trade Financial and a pawn shop in Alabama bearing Focia's name and that same address in Montgomery.

Second, the government also introduced a fair amount of powerful circumstantial evidence from which a jury could reasonably infer that Focia resided in Alabama at the time he shipped firearms to undercover agents located in Nebraska and New Jersey, respectively. For example, the government presented evidence that the car Focia drove in August 2013 was registered to his daughter at an address in Montgomery discovered to be the same as Focia's address of record. And Rudden-Conway testified that her investigation of Focia did not turn up any addresses outside of Alabama. She further explained that she had discovered "no reason to believe [he] lived in another state." Agents also surveilled the Eclectic, Alabama, home that ATF searched. Agents testified that ATF had followed Focia to that home, surveilled the residence for a year and a half, and had noticed Focia's vehicle parked outside it on several occasions. In addition, the government presented testimony that Focia's lease for the home in Eclectic, Alabama, had

12

expired right around the time the agents decided to execute a search warrant there. Finally, ATF found Focia's personal belongings inside the home in Eclectic.

Focia takes issue with the government's reliance on circumstantial evidence to demonstrate that he was a resident of Alabama in 2013 and 2014. But we apply the same standard when we evaluate the sufficiency of the evidence, regardless of whether the evidence is direct or circumstantial. *United States v. Peddle*, 821 F.2d 1521, 1525 (11th Cir. 1987) (citing *Holland v. United States*, 348 U.S. 121 (1954)). And here, a reasonable jury could have (and did) conclude that Focia resided in Alabama during both the Nebraska and New Jersey sales. For this reason, the district court did not err in denying Focia's motion for judgment of acquittal on this basis as to Counts 2 and 3.

### 2. Federal-firearms-license Status

Focia limits his argument here to Count 2, which charges the August 9, 2013, shipment of a firearm to Kessler in Nebraska. Focia asserts, for the first time on appeal, that the government failed to demonstrate that Kessler lacked a federal firearms license at the time of the transfer, as required by the plain language of 18 U.S.C. § 922(a)(5). For that reason, Focia contends, the evidence was insufficient to support a conviction on Count 2.

When a defendant fails to preserve an argument about the sufficiency of the evidence, "we will reverse the conviction only where doing so is necessary to

prevent a manifest miscarriage of justice." *Fries*, 725 F.3d at 1291 (internal quotation marks and citation omitted). To satisfy this standard, the record must be "devoid of evidence of an essential element of the crime[,] or . . . the evidence on a key element of the offense [must be] so tenuous that a conviction would be shocking." *Id.* (internal quotation marks omitted). That is not the case here.

At trial, Kessler answered the following questions about his federal-firearms-license status:

> Q: Are you familiar with what an FFL is?
>
> A: Yes, I am.
>
> Q: What does that mean?
>
> A: Federal firearms licensee.
>
> Q: And are you an FFL?
>
> A: No, I'm not.
>
> Q: Did you ever, in your transaction that you just discussed, did you ever represent yourself to be an FFL?
>
> A: No, I did not.

Focia argues that Kessler's present-tense response to the question asking whether he is an FFL cannot carry the government's burden of demonstrating that he was not an FFL at the time of the purchase.

Because Focia failed to move for acquittal on this issue below, we must "affirm so long as we find some paucity of evidence that could have supported the

jury's finding that the person to whom [Focia] sold a firearm . . . did not possess an FFL at the time of the transfer." *Fries*, 725 F.3d at 1293. Kessler's testimony satisfies this standard. Unlike in *Fries*, where even the government conceded that the record contained no evidence at all regarding the transferee's federal-firearms-license status, here the government directly questioned Kessler about his license status and received a direct answer. A reasonable jury could have understood Kessler's testimony to mean that he did not have a federal firearms license at the time of the purchase charged in Count 2. Kessler's testimony certainly exceeds a "paucity of evidence" as to this issue. As a result, Focia's conviction as to Count 2 is affirmed.

## B.

Focia next challenges the district court's instructions to the jury on Count 1. The district court gave the Eleventh Circuit Pattern Jury Instruction Offense Instruction 34.1 (Jan. 2015), dealing in firearms without a license, in violation of 18 U.S.C. §922(a)(1)(A). Focia asserts that the instructions allowed the jury to convict him for conduct not criminalized under the plain language of the statute.

We review de novo the legal correctness of jury instructions but review the phrasing of the instructions for abuse of discretion. *See United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). On a challenge to a district court's jury instructions, "we will not reverse a conviction . . . unless the issues of law were

15

presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Id.* (internal quotation marks and citation omitted). Jury instructions are also "subject to harmless error review." *United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012) (quotation marks and citation omitted). "An error is harmless if the reviewing court is satisfied beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 1197 (internal quotation marks and citation omitted).

The jury instruction at issue read as follows:

> It's a Federal crime under 18 U.S.C. § 922(a)(1)(A) to engage in the business of dealing in firearms without a Federal license.
>
> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:
>
> 1. the Defendant engaged in the business of dealing in firearms;
> 2. the Defendant didn't have a Federal license; and
> 3. the Defendant acted willfully.
>
> * * *
>
> A person is "engaged in the business of dealing in firearms" if the person regularly purchases and resells firearms with the principal objective of livelihood and profit. "Livelihood" includes both making a living *and supplementing one's income*. Some things that are not the "business of dealing in firearms" are occasionally selling, exchanging, or purchasing firearms for one's own

16

personal collection or selling all or part of one's own personal collection.

A "dealer" is any person "engaged in the business of dealing in firearms," at wholesale or retail, *even if that's not the person's primary business or job*.

In determining whether a Defendant had the principal objective of livelihood and profit, you may consider all of the circumstances surrounding the transactions, including: the quantity and the frequency of sales; conditions under which the sales occurred; Defendant's behavior before, during, and after the sales; the price charged; and the characteristics of the firearms sold. The Government need not show that the Defendant actually made a profit, so long as the Defendant's principal objective was livelihood and profit.

* * *

(Emphasis added).

Focia challenges the definitions of "dealer" and "engaged in the business of dealing in firearms." He complains of three alleged errors: (1) the instruction that "livelihood" includes "supplementing one's income"; (2) the words "even if that's not the person's primary business or job" in the definition of "dealer"; and (3) the absence from the instruction detailing what is not the "business of dealing firearms" of any express reference to the statutory exemption for hobby sales. In Focia's view, the alleged errors allowed the jury to convict him even if the jury believed him to be nothing more than a hobbyist who supplemented his income through the occasional sale of firearms. Although all of Focia's complaints go to

17

the issue of whether Focia sold firearms as a business or instead whether he sold guns incidental to a gun-collecting hobby or otherwise as a hobby, we begin by addressing the first two complaints together and separately address the third complaint later.

We find no merit to either of Focia's first two complaints. The language of the jury instruction was consistent with both the statutory language and congressional intent.

Section 922(a)(1)(A) provides, as relevant here, that it is unlawful "for any person except a . . . licensed dealer, to engage in the business of . . . dealing in firearms." The statute then sets forth a number of definitions relevant to discerning the meaning of § 922(a)(1)(A). In particular, the statute defines a "dealer" as "any person engaged in the business of selling firearms at wholesale or retail." 18 U.S.C. § 921(a)(11)(A). A person is "engage[d] in the business of dealing in firearms," in turn, if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). "[W]ith the principal objective of livelihood and profit" means that "the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C.

18

§ 922(a)(22). Finally, the statute specifies that despite these definitions, a person is not "engaged in the business of dealing in firearms" if that person "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or . . . sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C).

The plain import of this statutory language reflects congressional intent to criminalize the selling of guns as a business—whether as the seller's sole means of income or as the seller's side business—by a person who is not a licensed firearms dealer. It also reveals congressional intent not to criminalize the selling of firearms by an unlicensed dealer who merely seeks to improve or otherwise modify a personal collection or to infrequently sell an odd gun here or there.

True, we have recognized that Congress, by enacting the Firearm Owners' Protection Act ("FOPA") in 1986, amended and clarified the Gun Control Act of 1968 by more narrowly "defining the term 'engaged in the business' as it applied to a dealer in firearms," *United States v. Schumann*, 861 F.2d 1234, 1237 (11th Cir. 1988), to "protect law-abiding citizens with respect to the acquisition, possession, or use of firearms for lawful purposes."[7] *Bryan v. United States*, 524 U.S. 184, 187 (1998). But nothing in the amendments or the rest of the statutory language

---

[7] Prior to the 1986 amendments, the term "engaged in the business" as it related to the sale of firearms "was subject to judicial interpretation." *United States v. Schumann*, 861 F.2d 1234, 1237 n. 2 (11th Cir. 1988).

indicates that a person violates § 922(a)(1)(A) only by selling firearms as his primary means of income. And the word "hobby"—which Focia suggests includes the regular sale of guns for profit and financial gain, so long as it is not the seller's primary source of income—simply cannot bear the weight that Focia seeks to put on it.

The exact percentage of income obtained through the sales is not the test; rather, we have recognized that the statute focuses on the defendant's motivation in engaging in the sales. *See United States v. Bailey*, 123 F.3d 1381, 1392 (11th Cir. 1997) ("In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business.") (quotation marks and citation omitted). So a defendant who maintains a full-time job but also sells firearms in his spare time is not automatically excluded from the statute's reach. The pattern jury instruction adequately conveys these requirements of § 922(a)(1)(A) to the jury and represents a correct statement of the law.

And even if it did not, any error in this respect would have been harmless because the jury had no basis in the record on which it could have concluded that Focia's various firearms sales were motivated by anything other than a desire for profit. Nothing suggested that Focia sold firearms for the various nonpecuniary reasons specified in the statute, such as "the enhancement of a personal collection"

20

or "a hobby."  To the contrary, all the evidence introduced at trial demonstrated that Focia bought firearms from a variety of sources and then almost immediately turned around and sold them at a steep profit to make money from those individuals who, for one reason or another, could not obtain firearms lawfully. And he did so on the Dark Web, not out in the open as some type of legal hobby.

Indeed, Focia used Dark Web sites to list his firearms for sale, implemented a rigid procedure for ensuring funds were properly placed in escrow before shipping firearms, displayed an aversion to lowering the asking price, and referred to his firearms as "stock" and his sales as "business."  And during his transaction with Kessler, Focia messaged Kessler to implore him not to "forget about [Focia]" since Focia had "busted [his] ass to get [the gun] to [Kessler] in two days"—an implicit plea for return business.  Evidence in the record also demonstrated that Focia completed two transactions with undercover agents, often shipped weapons abroad, maintained at least eight firearms at his residence, and had listed an additional three firearms for sale on the Dark Web that agents were unable to recover.  And finally, despite efforts to obtain Focia's tax returns and Social Security information, agents found no evidence that Focia enjoyed any source of income other than his firearms sales.  This evidence overwhelmingly demonstrates that Focia's sales of firearms were no more a hobby than working at Burger King for a living could be described that way.

We now turn to Focia's asserted third instructional error—the omission of the language regarding hobby sales from the list of activities not criminalized under the statute.  We note that the pattern jury instruction closely tracks the language of § 921(a)(21)(C) when defining the phrase "engaged in the business of dealing in firearms"—except it omits the phrase "or for a hobby."  Focia objected to this omission at two charge conferences and in written submissions to the court, but the district court denied his requests to add the language "or for a hobby."

A district court abuses its discretion in refusing to give a requested jury instruction if (1) the instruction is a substantially correct statement of the law, (2) the instruction was not covered by the charge actually given, and (3) the instruction dealt with some point in the trial so important that failure to give the instruction seriously impaired the defendant's ability to present an effective defense.  *United States v. Browne*, 505 F.3d 1229, 1276 (11th Cir. 2007).  Though we conclude that Focia established the first two requirements, he did not demonstrate the third, so we find no abuse of discretion.

The pattern jury instructions are "drafted by a committee of district judges appointed by the Chief Judge of the Circuit and adopted by resolution of the Judicial Council of the Eleventh Circuit."  *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007).  For this reason, we have recognized that they are a "valuable

22

resource" and are generally reliable. *Id.* (internal quotation marks omitted). Nevertheless, they are not infallible, and they do not represent binding law. *Id.*

Here, we agree with Focia that the instruction's omission of the phrase "or for a hobby" is peculiar, given that the instruction clearly draws its definition of the phrase "business of dealing in firearms" from § 921(a)(21)(C), which specifically notes that those who "make[] occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection *or for a hobby*" are exempted from the reach of the criminal statute. 18 U.S.C. § 921(a)(21)(C) (emphasis added). "[W]e must not read any provision, or even any word, of a statute so as to make it superfluous," *United States v. Velez*, 586 F.3d 875, 877 (11th Cir. 2009) (internal quotation marks and citation omitted), and must instead "give effect . . . to every clause and word of a statute, avoiding . . . any construction which implies that the legislature was ignorant of the meaning of the language it employed." *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883). Here, though the pattern instruction is careful to identify "[s]ome things that are not the business of dealing in firearms," it describes only activities related to personal gun collections. Yet the statute clearly anticipates the inclusion of more activities than that when it employs the phrase "*or* for a hobby" (emphasis added), since that phrase is separated in the statute from the phrase "the enhancement of a personal collection" by the disjunctive "or," suggesting that the two phrases are not synonymous. *See* Antonin

23

Scalia & Bryan A. Garner, *Reading Law: An Interpretation of Legal Texts* 116 (2012). We therefore conclude that the pattern instruction should not omit the phrase "or for a hobby."

This error, however, does not warrant reversal of Focia's conviction on Count 1. As we have discussed, the trial included no evidence from which a jury could have concluded that Focia was a mere hobbyist gun collector. Instead, the evidence supported only the conclusion that Focia was a savvy seller of firearms for profit. So failure to include the requested language in no way impaired Focia's ability to present a defense. As a result, the district court did not abuse its discretion in failing to include Focia's proposed language.

## C.

Focia also challenges the statute that forms the basis of his conviction under Count 1—18 U.S.C. § 922(a)(1)(A)—as an impermissible prior restraint in violation of the Second Amendment[8] because it criminalizes dealing in firearms without a license. Acknowledging the novelty of his argument, Focia concedes that it cannot succeed unless we determine that the First Amendment's prior-restraint framework applies equally to the rights protected by the Second Amendment. We therefore begin by addressing whether the prior-restraint

---

[8] The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Cons. amend. II.

24

doctrine should be extended to cover the rights protected by the Second Amendment.[9]

Focia relies on the Supreme Court's opinion in *District of Columbia v. Heller*, 554 U.S. 570 (2008), in support of his argument that challenges to laws regulating rights protected by the Second Amendment should be analyzed similarly to challenges advanced under the First Amendment. He urges us to find this leap logical in light of the Supreme Court's reliance on First Amendment jurisprudence when deciding the Second Amendment issues raised in *Heller*. *See United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("*Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment.").

Specifically, Focia asserts that § 922(a)(1)(A) represents an impermissible prior restraint of his Second Amendment rights because it "subject[s] the exercise of [his Second Amendment] freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority . . . ." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). This issue is one of first impression in our Circuit.

---

[9] Generally, we review a district court's denial of a motion to dismiss the indictment for an abuse of discretion. *United States v. Di Pietro*, 615 F.3d 1369, 1370 n.1 (11th Cir. 2010). "But when that motion challenges the constitutionality of a statute, we review de novo the interpretation of the statute by the district court." *Id.* (internal quotation marks omitted).

25

But five of our sister circuits have already addressed it. And none have extended First Amendment prior-restraint doctrine into the Second Amendment arena. *See Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012) (finding First Amendment prior-restraint doctrine to be "a poor analogy for purposes of facial challenges under the Second Amendment"); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 92 (2d Cir. 2012) (noting that "it would be as imprudent to assume that the principles and doctrines developed in connection with the First Amendment apply equally to the Second, as to assume that rules developed in the Second Amendment context could be transferred without modification to the First" and holding that the "attempts . . . to draw analogies to First Amendment concerns come up short"); *Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013) (holding that "it would not be appropriate to import First Amendment prior restraint doctrine to [the court's] analysis of Appellants' Second Amendment challenge"); *Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 422 (2013) ("Like the Second Circuit . . . [w]e are hesitant to import substantive First Amendment principles wholesale into Second Amendment jurisprudence."); *Berron v. Ill. Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 843 (2017) (finding plaintiffs' attempted application of First Amendment prior-restraint doctrine to the Second Amendment to be

26

flawed because while "everyone is entitled to speak and write . . . not everyone is entitled to carry a concealed firearm in public").

We agree with our sister circuits. We therefore join them in declining to import the First Amendment's prior-restraint framework into an analysis of challenges brought under the Second Amendment. As a result, we conclude that Focia's Second Amendment challenge to 18 U.S.C. § 922(a)(1)(A) fails, and the district court did not err in denying his motion to dismiss Count 1 on this basis.

**D.**

Counts 2 and 3 charge Focia with violating 18 U.S.C. § 922(a)(5). That statute provides,

> It shall be unlawful for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in . . . the State in which the transferor resides[.]

18 U.S.C. § 922(a)(5).

In this second of Focia's two challenges to the constitutionality of a federal firearms statute, Focia argues that the district court erred in denying his motion to dismiss Counts 2 and 3 because a prohibition on the unlicensed transfer of a firearm to a resident of another state infringes a right at the very core of the Second Amendment. Focia asserts that the statute should be subject to strict scrutiny or (at

27

a minimum) intermediate scrutiny and that it cannot withstand review under either standard.

Generally, we review for an abuse of discretion a district court's denial of a motion to dismiss the indictment. *United States v. Di Pietro*, 615 F.3d 1369, 1370 n.1 (11th Cir. 2010). "But when that motion challenges the constitutionality of a statute, we review *de novo* the interpretation of the statute by the district court." *Id.* (internal quotation marks and citation omitted).

We employ a two-step inquiry when faced with Second Amendment challenges: "first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we . . . apply the appropriate level of scrutiny." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012) ("*GeorgiaCarry.Org I*"). If the challenged regulation does not burden conduct within the scope of the Second Amendment as historically understood, then the law comports with the Second Amendment. But if it does, then we must apply an appropriate form of means-end scrutiny.

At its "core," the Supreme Court has explained, the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 634-35. It codified a pre-existing "individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

For these reasons, the Supreme Court, in *Heller*, invalidated a law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628. Two years later, in *McDonald v. City of Chicago*, the Supreme Court held that the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*" because the right is "fundamental" to "our system of ordered liberty." 561 U.S. 742, 778, 791 (2010).

Though the Second Amendment guarantees an individual right, that right is not without its limits. *Heller*, 554 U.S. at 626. Indeed, the Court in *Heller* catalogued a non-exhaustive list of "presumptively lawful regulatory measures" that have historically constrained the scope of the right. *Id.* at 626-27 & n.26. These measures include, among others, "longstanding prohibitions on the possession of firearms by felons and the mentally ill, [ ] laws forbidding the carrying of firearms in sensitive places such as school and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27; *see also McDonald*, 561 U.S. at 786 (reiterating *Heller*'s assurances that that the decision "did not cast doubt on such longstanding regulatory measures"). These measures comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and

29

bear arms. *See Heller*, 554 U.S. at 631, 635 (suggesting that one is "disqualified from the exercise of Second Amendment rights" if he is "a felon" or "insane").

Accounting for these types of "longstanding prohibitions, "since the Supreme Court issued *Heller*, we have (1) upheld the constitutionality of § 922(g)(1) because "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment[,]" *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); (2) upheld the constitutionality of § 922(g)(9), which closed the "dangerous loophole" that placed many violent domestic abusers outside the scope of § 922(g)(1) because they were never charged with or convicted of felonies, *United States v. White*, 593 F.3d 1199 (11th Cir. 2010); (3) upheld the constitutionality of a Georgia law barring the unrestricted carrying of firearms in eight specific locations, concluding that "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship against the owner's wishes," *GeorgiaCarry.Org I*, 687 F.3d at 1264; and (4) suggested that a U.S. Army Corps of Engineers' prohibition on the possession of firearms on its land is not *per se* unconstitutional because the regulation applies only to Corps property and is "narrowly cabined to a specific area . . . [an] area . . . specifically designated for recreation[,]" *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1326 (11th Cir. 2015).

Our prior precedent provides examples of laws that do not substantially burden the Second Amendment.  Section 922(a)(5), which does not go as far as some of the laws we have upheld in our precedent, likewise does not substantially burden the Second Amendment.

Here, the challenged provision prohibits only the transfer of a firearm by an unlicensed person to any other unlicensed person who resides in a different state than the state in which the transferor resides.  As a result, § 922(a)(5) only minimally affects the ability to acquire a firearm.  Unlike §§ 922(g)(1) and (9), which we upheld in *Rozier* and *White*, respectively, it does not operate to completely prohibit Focia or anyone else, for that matter, from selling or buying firearms.  Instead, it merely "impos[es] conditions and qualifications on the commercial sale of arms."  In other words, § 922(a)(1)(A) qualifies as the kind of "presumptively lawful regulatory measure[]" described in *Heller*.  *Heller*, 554 U.S. at 627 & n.26.  *Cf. United States v. Decastro*, 682 F.3d 160, 168-69 (2d Cir. 2012) (holding that § 922(a)(3), which prohibits the transportation into one's state of residence firearms acquired outside the state, "does not substantially burden [the] right to keep and bear arms" and "attempts only to assist states in the enforcement of their own gun laws"); *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (holding that "laws restricting activity lying closer to the margins of the

31

Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified").

Focia relies upon *Mance v. Holder*, 74 F. Supp. 3d 795 (N.D. Tex. 2015), *argued sub nom. Mance v. Lynch*, No. 15-10311 (5th Cir. Jan. 7, 2016), to argue the contrary position. *Mance* concluded that § 922(a)(5) regulates activity protected by the Second Amendment. But for the reasons we have explained above, we respectfully disagree with *Mance*.

In short, the district court did not err in denying Focia's motion to dismiss Counts 2 and 3.

### E.

Finally, Focia challenges the application of three sentencing enhancements, which operated to increase his offense level from a base offense level of 12 to an adjusted offense level of 24.

First, Focia argues that the district court clearly erred when it attributed to him eight guns found during the execution of the search warrant at the Eclectic home, three unrecovered guns listed on the Dark Web by a user thought to be Focia, and sixteen guns authorities deduced had been shipped internationally by Focia, even though authorities conceded that they had no direct evidence that the packages contained firearms. At most, Focia asserts, the government proved that five firearms counted, corresponding to no more than a two-level enhancement.

32

Second, Focia contends that the district court erroneously applied a four-level enhancement for the international transfer of firearms because the government established only that guns he once owned were found outside the country; not that he transferred firearms "with knowledge, intent, or reason to believe that [they] would be transported out of the United States."  U.S.S.G. § 2K2.1(b)(6)(A).

And finally, Focia contends that the district court erred in applying the obstruction-of-justice enhancement based on its finding that Focia "willfully set[] out to clog the gears of the judicial process" when, in Focia's view, he simply engaged in a vociferous defense of himself.

We need not decide whether the district court erroneously applied any of these three enhancements, however, because a decision either way will not affect the outcome of this case.  Rule 52(a), Fed. R. Crim. P., deems harmless any error that does not affect substantial rights, and requires that it be disregarded.  Errors are harmless when the government can show, beyond a reasonable doubt, that the error did not contribute to the defendant's ultimate sentence.  *United States v. Mathenia*, 409 F.3d 1289, 1291 (11th Cir. 2005).  Here, that is the case.

After the district court overruled Focia's objections, calculated what it believed to be the appropriate guidelines range, and found a 51-month sentence to be reasonable after considering the § 3553(a) factors, the court stated, "The Court

33

finds also that this 51-month sentence would have been the same regardless of how the guideline issues raised by both the defendant and the government had been resolved."

Where the district court states that it would have imposed the same sentence regardless of any guideline-calculation error, any error is harmless if the sentence would be reasonable even if the district court's guideline calculation was erroneous. *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). The record here demonstrates that the alleged errors are harmless, in any case.

If the district court had resolved all enhancement issues in Focia's favor, his advisory guidelines range would have been 15 to 21 months, instead of the 51-to-60-months range that the court applied. So we must ask whether the 51-month sentence the district court imposed is reasonable in light of an advisory range of 15 to 21 months. *See id.* at 1350 (noting that our review of the sentence imposed by a district court post-*Booker* is deferential, with the burden on the defendant to prove that his sentence is unreasonable in light of the record and § 3553(a)). We find that it is.

At sentencing, the district court explicitly opined that a sentence of 51 months was "a reasonable one when considering the 3553(a) factors." In support, the court expressly relied on (1) the nature and circumstances of the offense; (2) the history and characteristics of Focia himself; (3) the need to reflect the

34

seriousness of the offense to promote respect for the law and to provide just punishment for the offense; (4) the need to provide adequate deterrence to criminal conduct; and (5) the need to protect the public from further crimes by Focia. The court further elaborated that, in its view, Focia had purposefully attempted to thwart valid prohibitions against the trafficking of arms without a license by concealing shipments of firearms to individuals who may not have been able to purchase them legally. In this respect, the court was particularly troubled that Focia had shipped guns to countries that have strict gun laws. And the court also found relevant its conclusion that Focia was openly hostile to the laws of the United States.

We have previously held that "sentencing courts may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (quotation marks and citation omitted). That is, the guidelines are advisory, and a district court is free to vary from them if the court believes that the guidelines range does not properly reflect the § 3553(a) factors in a given case. *See id.* The district court's decision about how much weight to assign a particular sentencing factor is "committed to the sound discretion of the district court," *United States v. Williams*, 526 F.3d 1312,

35

1322 (11th Cir. 2008) (quotation marks omitted), and it is not our place to reverse even if we might have "gone the other way had it been our call." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). Nor does the mere fact that a sentence falls outside the guidelines range justify the application of a presumption of unreasonableness. *Gall v. United States*, 552 U.S. 38, 51 (2007).

Here, the district court announced that it considered all of the § 3553(a) factors in arriving at its 51-month sentence and specifically noted that it would impose exactly the same sentence even without the applicable enhancements. It further expounded on the reasons why. The district court's considerations as announced on the record sufficiently justified its selection of a 51-month sentence. Because the district court specifically indicated its intention to impose the same sentence regardless of guidelines-calculation error and the sentence it imposed was substantively reasonable, any "error did not affect the district court's selection of the sentence imposed" and was therefore harmless. For this reason, we affirm Focia's 51-month sentence.

## IV.

We **AFFIRM** Defendant-Appellant Focia's conviction and sentence.

**AFFIRMED.**